# Exhibit A

FILED
08-20-2025
Circuit Court, Iowa Co
Lia N. Leahy, Clerk
2025CV000101

**STATE OF WISCONSIN**         **CIRCUIT COURT**         **IOWA COUNTY**

| | |
|---|---|
| JESSICA S. PUKALA, on behalf of herself and on behalf of all other similarly situated individuals, | |
| | Case No. |
| 4111 State Rd. 91, Apt. 101 Oshkosh, WI 54904 | |
| | **JURY TRIAL DEMANDED** |
| Plaintiff, | |
| v. | |
| LANDS' END, INC., | |
| Five Lands' End Lane Dodgeville, WI 53595 | |
| Defendant. | |

## SUMMONS

STATE OF WISCONSIN

To each person named above as a defendant:

　　You are hereby notified that the plaintiff named above has filed a lawsuit or other legal action against you. The Complaint, which is attached, states the nature and basis of the legal action.

　　Within 45 days of receiving the Summons, you must respond with a written answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Complaint. The Court may reject or disregard an answer that does not follow the requirements of the statutes. The answer must be sent or delivered to the Court, whose address is 222 N. Iowa St. Dodgeville, WI 53533, and to plaintiff's attorney, whose address is 980 N. Michigan Ave., Suite 1610, Chicago, IL 60611. You may have an attorney help or represent you.

　　If you do not provide a proper answer within 45 days, the Court may grant judgment against you for the award of money or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future and may also be enforced by garnishment or seizure of property.

　　Dated this 20th day of August, 2025.

1

FILED
08-20-2025
Circuit Court, Iowa Co
Lia N. Leahy, Clerk
2025CV000101

**STATE OF WISCONSIN      CIRCUIT COURT      IOWA COUNTY**

| | |
|---|---|
| JESSICA S. PUKALA, on behalf of herself and on behalf of all other similarly situated individuals, | |
| 4111 State Rd. 91, Apt. 101 Oshkosh, WI 54904 | Case No. |
| | JURY TRIAL DEMANDED |
| Plaintiff, | |
| v. | |
| LANDS' END, INC., | |
| Five Lands' End Lane Dodgeville, WI 53595 | |
| Defendant. | |

**CLASS ACTION COMPLAINT**

Plaintiff Jessica S. Pukala ("Plaintiff"), individually and on behalf of all other similarly situated individuals (the "Class" or "Class Members," as defined below), by and through her undersigned counsel, files this Class Action Complaint against Lands End, Inc. ("LEI" or "Defendant") and alleges the following based on personal knowledge of facts, upon information and belief, and based on the investigation of her counsel as to all other matters.

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this class action lawsuit against LEI for its failure to protect and safeguard Plaintiff's and the Class's highly sensitive personally identifiable information ("PII" or "Private Information"). As a result of LEI's negligence and insufficient data security, cybercriminals easily accessed Defendant's inadequately protected corporate network on or around December 6, 2024 and accessed the PII of Plaintiff and the Class—approximately **10,060**

1

**individuals** (the "Data Breach" or "Breach").[1] Now, Plaintiff's and the Class's PII is in the hands of cybercriminals who will undoubtedly use their PII for nefarious purposes for the rest of their lives.

2.      Lands' End is a retail apparel and fashion company located in Wisconsin. Founded in 1963, Lands' End began with the goal of creating clothing and footwear in various sizes for all the family.  Headquartered in Dodgeville, Wisconsin, Lands' End has offices in the United States, Europe, and Asia, and employs over 3,000 individuals.[2]

3.      Plaintiff and the Class are current and former employees of LEI.[3]

4.      Included in the Class are LEI employees' dependents whose Private Information was provided to LEI by employees who obtained employee benefits, such as insurance, and provided their dependents' Private Information to LEI as part of the employee benefits enrollment process.[4]

5.      By collecting, storing, and managing Plaintiff's and the Class's Private Information, Defendant assumed legal and equitable duties to protect and safeguard Plaintiff's and the Class's Private Information against unauthorized access and disclosures.

6.      Upon information and belief, some of the members of the Class reside outside of Wisconsin.

7.      On December 6, 2024, LEI detected that an unauthorized third party had gained access to its corporate network.

---

[1]  *See* Maine Attorney General Data Breach Notifications at
https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-
a1252b4f8318/229b18d3-d2b9-4c05-99cd-f12a433fc941.html
[2] *See* Lands' End retail website at: https://www.landsend.com/about-us/
[3] *See* Exhibit 1, Notice Letter.
[4] *Id.*

2

8. LEI claims "some data from our corporate network had been copied, some of which could contain personal information" but confirmed that "[t]he impacted information may have included your Social Security number."[5]

9. The types of PII accessed and/or acquired in the Data Breach included, upon information and belief, highly sensitive information such as: names, demographic information (such as address, city, state, and zip code), and Social Security numbers (collectively, "Private Information").[6]

10. Despite discovering the Breach on December 6, 2025, Defendant delayed alerting victims of the Data Breach until on or around August 13, 2025, when it began sending out notice of data breach letters ("Notice Letters") to victims of the Data Breach.[7]

11. Upon information and belief, due to Defendant's negligence, cybercriminals have accessed and obtained everything they need to commit identity theft and wreak havoc on the financial and personal lives of thousands of individuals.

12. Now, and for the rest of their lives, Plaintiff and the Class Members will have to deal with the danger of identity thieves possessing and misusing their Private Information. Even those Class Members who have yet to experience identity theft have to spend time responding to the Breach and are at an immediate and heightened risk of all manners of identity theft as a direct and proximate result of the Data Breach. Plaintiff and Class Members have incurred and will continue to incur damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, deprivation

---

[5] *Id.*
[6] *Id.*
[7] *Id.*

3

of the value of their Private Information, loss of privacy, and/or additional damages as described below.

13.    In sum, Plaintiff and the Class will face an imminent risk of fraud and identity theft for the rest of their lives because: (i) LEI failed to protect Plaintiff's and the Class's Private Information, allowing a large and preventable Data Breach to occur; (ii) the cybercriminals who perpetrated the Breach accessed Private Information that they will sell on the dark web (if they have not already) because that is the *modus operandi* of cybercriminals who perpetrate breaches such as this; and (iii) LEI offered credit monitoring services to Plaintiff and the Class, an offer it need not make if no Private Information was stolen and at risk of misuse.

14.    Plaintiff brings this action individually and on behalf of the Class, seeking compensatory damages, punitive damages, nominal damages, restitution, and injunctive and declaratory relief, reasonable attorney fees and costs, and all other remedies this Court deems proper.

## II.    THE PARTIES

15.    Plaintiff **Jessica S. Pukala** is an individual domiciled in Oshkosh, Wisconsin.[8] Plaintiff received a Notice of Data Breach Letter ("Notice Letter") from Defendant dated August 13, 2025.[9] Plaintiff Pukala is a former employee of LEI and was employed by LEI between 2019 and 2023.

16.    Defendant **Lands' End, Inc**. is a Wisconsin foreign business corporation with its principal place of business at 5 Lands End Ln. Dodgeville, WI 53595. LEI's registered agent is C T Corporation System with a service address at 301 S. Bedford St. Suite 1 Madison, WI 53703.

---

[8] *Id.*
[9] *Id.*

4

LEI conducts its operations in and is headquartered in Dodgeville, Wisconsin and conducts substantial business in this county.

### III.    JURISDICTION AND VENUE

17.    Defendant is a citizen of Wisconsin because it is incorporated in Wisconsin with its principal place of business in Dodgeville, Wisconsin.

18.    This Court has subject matter jurisdiction over this case pursuant to Wis. Stat. § 753.03 because it is a court of general jurisdiction.

19.    This Court has personal jurisdiction over Defendant pursuant to Wis. Stat. § 801.05 because Defendant conducts substantial business in Wisconsin and this county and collected and/or stored Private Information of Plaintiff and Class Members in this county.

20.    Venue is proper in this Court pursuant to Wis. Stat. § 801.50 because Defendant is domiciled in this county, Defendant's principal place of business is in this county, Defendant operates in this county, and a substantial part of the events or omissions giving rise to Plaintiff and the Class Members' claims occurred in this county, including Defendant collecting and/or storing the Private Information of Plaintiff and Class Members.

### IV.    FACTUAL ALLEGATIONS

**A.    Defendant and its Collection of Plaintiff's and the Class's PII.**

21.    LEI states that it "is a leading digital retailer of solution-based apparel, swimwear, outwear, accessories, footwear, home products and information. We offer products online at www.landsend.com, through third-party distribution channels and our own Company Operated stores. We also offer products to businesses and schools, for their employees and students, through

5

the Outfitters distribution channel. We are a classic American lifestyle brand that creates solutions for life's every journey."[10]

22.     It is estimated that LEI's annual revenue is over $1.34 billion per year.[11] In other words, LEI could have afforded to implement adequate data security prior to the Breach but deliberately chose not to.

23.     It is estimated that LEI employs approximately 4,400 individuals.[12]

24.     In the ordinary course of business, LEI receives the Private Information from individuals, such as Plaintiff and the Class, as part of the onboarding employment process. Specifically, current and former employees of LEI provided LEI with their, and their dependents', Private Information in the course of applying for employment and/or enrolling in employee benefits such as insurance coverage.

25.     LEI obtains, collects, uses, and derives a benefit from the Private Information of Plaintiff's and Class Members. LEI also uses the Private Information it collects to provide services and employment, making a profit therefrom. LEI would not be able to employ individuals if not for the acceptance and use of Plaintiff's and the Class's Private Information.

26.     By collecting Plaintiff's and the Class's Private Information, LEI assumed legal and equitable duties to Plaintiff and the Class to protect and safeguard their Private Information from unauthorized access and intrusion.

27.     LEI recognized it had a duty to use reasonable measures to protect the Private Information that it collected and maintained.

---

[10] https://investors.landsend.com/#:~:text=Who%20We%20Are-,Lands%27%20End%2C%20Inc.,8:30%20am%20EDT
[11] https://stockanalysis.com/stocks/le/revenue/
[12] *Id.*

28.    LEI failed to adopt reasonable and appropriate data security practices and procedures including administrative, physical security, and technical controls to safeguard Plaintiff's and the Class's Private Information.

29.    As a result, Plaintiff's and Class Members' Private Information was accessed and/or stolen from LEI's inadequately secured corporate network in a large and preventable Data Breach.[13]

**B. LEI's Data Breach.**

30.    On or around August 13, 2025, Defendant began sending Notice Letters that state in part as follows:

**Notice of Data Security Incident**

Dear ◇ ◇,

**What Happened?**

On December 6, 2024, Lands' End detected that an unauthorized third party had gained access to a small portion of its corporate network. Upon detection of the unauthorized activity, we immediately took steps to contain the issue and investigate what happened with the assistance of law enforcement, industry-leading cybersecurity experts, and outside counsel.

Through that investigation, we learned that some data from our corporate network had been copied, some of which could contain personal information. We also conducted a thorough review of the impacted data to determine whether personal information was involved in any way so that we could notify potentially affected individuals.

While the incident resulted in temporary changes to the way we used our internal systems, it did not interfere with our commercial operations or the ability to service our customers. In addition, there was no impact on customer-focused systems, including our ecommerce website.

**What Information Was Involved?**

Through our investigation, we confirmed on August 3, 2025, that personal information belonging to some current and former employees and some of their dependents was accessed. This information had either been provided to or collected by Lands' End or was voluntarily stored by employees on Lands' End-owned

---

[13] Ex. 1.

devices. The impacted information may have included your Social Security number.

**What We Are Doing**

Beyond the investigation discussed above, we have also worked with outside cybersecurity experts to reinforce our systems and information security protocols in an effort to help prevent incidents like this from occurring in the future. Please know that we will continue prioritizing strong cybersecurity practices to best protect Lands' End and our stakeholder.

Your safety and security are a high priority, and, to help protect you, we are providing you with access to Experian **IdentityWorks**[SM] **credit monitoring and remediation services for 24 months at no charge to you**. For two years from the date of enrollment, these services provide you with alerts when changes occur to your credit file. These services also provide you with proactive fraud assistance to help with any questions that you might have or in the event that you become a victim of fraud. We have also provided below additional actions you can take to best protect yourself

**What You Can Do**

To help protect your personal information, we strongly recommend you take the following steps, all of which are good ideas in any event:

- **Enroll in the credit monitoring service that we are offering to you**. This will enable you to get alerts about any efforts to use your name and confidential information to establish credit and restoration assistance if you were not the one who initiated it.
- **Carefully review statements** sent to you by your bank, credit card company, or other financial institutions as well as government institutions like the Internal Revenue Service (IRS). Notify the sender of these statements immediately by phone and in writing if you detect any suspicious transactions or other activity you do not recognize.
- The attached **Reference Guide** describes additional steps that you can take and provides resources for additional information. We encourage you to read and follow these steps as well as taking the actions outlined in the two previous bullets.

**For More Information**

If you have questions or concerns, please contact us via Questions.DataNotice@landsend.com. Please know that we take this matter very seriously, and we apologize for the concern and inconvenience this may cause you.[14]

---

[14] *Id.*

31.    Thus, despite discovering the Data Breach in December 2025, LEI did not begin notifying individuals of the Data Breach until August 2025—eight months later.[15]

32.    In recognition of the severity of the Data Breach, and the imminent risk of harm Plaintiff and the Class face, LEI offered a 24-month credit monitoring service.[16] Such an offering is inadequate and will not prevent identity theft but will only alert Data Breach victims once identity theft has already occurred.

33.    All in all, LEI failed to take the necessary precautions required to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized access and exploitation.

34.    Defendant's actions represent a flagrant disregard of the rights of Plaintiff and the Class, both as to privacy and property.

**C.    Cybercriminals Have Used and Will Continue to Use Plaintiff's and the Class's PII to Defraud Them.**

35.    PII is of great value to hackers and cybercriminals, and the data stolen in the Data Breach can and will be used in a variety of ways by criminals to exploit Plaintiff and the Class Members and to profit from their misfortune.

36.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[17]

37.    For example, with the PII stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns,

---

[15] *Id.*
[16] *Id.*
[17] *Facts + Statistics: Identity Theft and Cybercrime*, INSURANCE INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

commit crimes, create false driver's licenses and other forms of identification and sell them to

other criminals or undocumented immigrants, steal government benefits, give breach victims'

names to police during arrests, and many other harmful forms of identity theft.[18] These criminal

activities have and will result in devastating financial and personal losses to Plaintiff and the Class

Members.

38.    Social security numbers are particularly sensitive pieces of personal information.

As the Consumer Federation of America explains:

> **Social Security number.** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[19]

39.    PII is such a valuable commodity to identity thieves that once it has been

compromised, criminals will use it for years.[20]

40.    This was a financially motivated Breach, as the only reason the cybercriminals go

through the trouble of running targeted cyberattacks against companies like LEI is to get ransom

money and/or information that they can monetize by selling on the black market for use in the

kinds of criminal activity described herein.

---

[18] *See, e.g.*, Christine DiGangi, *What Can You Do with a Stolen Social Security Number*, CREDIT.COM (June 29, 2020), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[19] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (emphasis added).

[20] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, available at https://www.gao.gov/products/gao-07-737.

41. Indeed, a Social Security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[21]

42. "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[22]

43. These risks are both certainly impending and substantial. As the Federal Trade Commission ("FTC") has reported, if hackers get access to PII, *they will use it*.[23]

44. Hackers may not use the information right away, but this does not mean it will not be used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information *may continue for years*. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[24]

45. For instance, with a stolen social security number, which is part of the PII compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[25]

---

[21] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web* (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

[22] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

[23] Ari Lazarus, *How fast will identity thieves use stolen info?*, MILITARY CONSUMER (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info.

[24] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (July 5, 2007), available at https://www.gao.gov/products/gao-07-737.

[25] *See, e.g.*, Christine DiGangi, *What Can You Do with a Stolen Social Security Number*, CREDIT.COM (June 29, 2020), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

46. Identity theft victims must spend countless hours, and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[26]

47. Defendant's offer of two (2) years of credit monitoring service to Plaintiff and the Class is woefully inadequate and will not fully protect Plaintiff from the damages and harm caused by its failures.

48. The full scope of the harm has yet to be realized. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used.

49. Once the 24-months have expired, Plaintiff and Class Members will need to pay for their own credit monitoring and identity theft protection for the rest of their lives due to LEI's gross negligence.

50. Furthermore, identity monitoring only alerts someone to the fact that they have already been the victim of identity theft (*i.e.*, fraudulent acquisition and use of another person's PII)—it does not prevent identity theft.[27] Nor can an identity monitoring service remove personal information from the dark web.[28]

51. "The people who trade in stolen personal information [on the dark web] won't cooperate with an identity theft service or anyone else, so it's impossible to get the information removed, stop its sale, or prevent someone who buys it from using it."[29]

---

[26] *Guide for Assisting Identity Theft Victims*, FEDERAL TRADE COMMISSION (Sept. 2013), *available at* https://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

[27] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, CNBC (Nov. 30, 2017, 9:00 AM), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html.

[28] *Dark Web Monitoring: What You Should Know,* CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know.

[29] *Id.*

52.    As a direct and proximate result of the Data Breach, Plaintiff and the Class have been damaged and have been placed at an imminent, immediate, and continuing increased risk of harm from continued fraud and identity theft. Plaintiff and the Class must now take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

53.    Even more seriously is the identity restoration that Plaintiff and other Class Members must go through, which can include spending countless hours filing police reports, filling out IRS forms, Federal Trade Commission checklists, Department of Motor Vehicle driver's license replacement applications, and calling financial institutions to cancel fraudulent credit applications, to name just a few of the steps Plaintiff and the Class must take.

54.    Plaintiff and the Class have or will experience the following concrete and particularized harms for which they are entitled to compensation, including:

    a.    Actual identity theft;

    b.    Trespass, damage to, and theft of their personal property including PII;

    c.    Improper disclosure of their PII;

    d.    The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

    e.    Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cyber criminals have their PII;

13

     f.  Ascertainable losses in the form of time taken to respond to identity theft and attempt to restore identity, including lost opportunities and lost wages from uncompensated time off from work;

     g.  Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

     h.  Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class Members' Private Information for which there is a well-established and quantifiable national and international market;

     i.  The loss of use of and access to their credit, accounts, and/or funds;

     j.  Damage to their credit due to fraudulent use of their PII; and/or

     k.  Increased cost of borrowing, insurance, deposits, and the inability to secure more favorable interest rates because of a reduced credit score.

55.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which remains in the possession of Defendant, is protected from further breaches by the implementation of industry standard security measures and safeguards. Defendant has shown itself wholly incapable of protecting Plaintiff's and the Class's Private Information.

56.    Plaintiff and Class Members also have an interest in ensuring that their Private Information that was provided to LEI is removed from all LEI servers, systems, and files.

57.    Defendant itself acknowledged the harm caused by the Data Breach because it offered Plaintiff and Class Members woefully inadequate credit monitoring services. Twenty-four (24) months of credit monitoring is, however, inadequate to protect Plaintiff and Class Members from a lifetime of identity theft risk.

58.     Defendant further acknowledged that the Data Breach would cause inconvenience to affected individuals and that financial harm would likely occur because it advised individuals to enroll in credit monitoring, place a fraud alert/security freeze on credit files, and obtain a free credit report.

59.     LEI also admitted its current data security measures were not adequate because it stated, "we have also worked with outside cybersecurity experts to reinforce our systems and information security protocols in an effort to help prevent incidents like this from occurring in the future."

60.     These reinforced protections should have been in place before the Data Breach.

61.     At LEI's suggestion, Plaintiff and the Class are desperately trying to mitigate the damage that LEI has caused them.

62.     Given the kind of Private Information LEI made accessible to hackers, however, Plaintiff and the Class are certain to incur additional damages. Because identity thieves have their PII, Plaintiff and all Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number.[32]

63.     "None of this should have happened because the Data Breach was entirely preventable.

[32] *What happens if I change my Social Security number*, LEXINGTON LAW (Aug. 10, 2022), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html.

, , **D.    Defendant was Aware of the Risk of Cyberattacks.**

64.    Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some of the biggest cybersecurity breaches: Target,[33] Yahoo,[34] Marriott International,[35] Chipotle, Chili's, Arby's,[36] and others.[37]

65.    The number of data breach victims has surpassed 1 billion for the first half of 2024, according to the Identity Theft Resource Center.[38]

66.    LEI should certainly have been aware, and indeed was aware, that it was at risk of a data breach that could expose the PII that it collected and maintained.

67.    LEI was clearly aware of the risks it was taking and the harm that could result from inadequate data security but threw caution to the wind.

---

[33] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

[34] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[35] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/ (last visited Oct. 9, 2023).

[36] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018, 12:58 PM), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[37] *See, e.g.*, Michael Hill and Dan Swinhoe, *The 15 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Nov. 8, 2022), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

[38] https://www.usatoday.com/story/money/2024/07/18/data-breach-what-to-do/74441060007/.

### E.      LEI Could Have Prevented the Data Breach.

68.     Data breaches are preventable.[39] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[40] he added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[41]

69.     "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[42]

70.     In a data breach like this, many failures laid the groundwork for the Breach.

71.     The FTC has published guidelines that establish reasonable data security practices for businesses.

72.     The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[43]

---

[39] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.
[40] *Id.* at 17.
[41] *Id.* at 28.
[42] *Id.*
[43] *Protecting Personal Information: A Guide for Business*, FTC, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

73.    The FTC guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems.

74.    The FTC guidelines also recommend that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

75.    According to information and belief, LEI failed to maintain many reasonable and necessary industry standards necessary to prevent a data breach, including the FTC's guidelines.

76.    Upon information and belief, LEI also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

77.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[44]

78.    To prevent the Data Breach, Defendant could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

---

[44] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- "Implement an awareness and training program." Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

*Id. at 3-4.*

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[45]

79.    Further, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks....

---

[45] *Id.* at 3–4.

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you

when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic....[46]

80. In addition, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**
  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audit; remove privileged credentials

- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise;

- **Include IT Pros in security discussions**
  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**
  - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

---

[46] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), available at https://www.cisa.gov/news-events/news/protecting-against-ransomware.

- **Apply principle of least-privilege**

  - Monitor for adversarial activities

  - Hunt for brute force attempts

  - Monitor for cleanup of Event Logs

  - Analyze logon events

- **Harden infrastructure**

  - Use Windows Defender Firewall

  - Enable tamper protection

  - Enable cloud-delivered protection

  - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[47]

81.    Given that Defendant was storing the PII of thousands of individuals, Defendant could have and should have implemented all of the above measures to prevent and detect cyberattacks.

82.    Specifically, among other failures, LEI had far too much confidential unencrypted information held on its systems. Such PII should have been segregated into an encrypted system.[48]

83.    Moreover, it is a well-established industry standard practice for a business to dispose of confidential PII once it is no longer needed.

84.    The FTC, among others, has repeatedly emphasized the importance of disposing unnecessary PII, saying simply: "Keep sensitive data in your system only as long as you have a

---

[47] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

[48] *See, e.g.,* Adnan Raja, *How to Safeguard Your Business Data with Encryption*, FORTRA (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

business reason to have it. Once that business need is over, properly dispose of it. If it's not on your system, it can't be stolen by hackers."[49] LEI, rather than following this basic standard of care, kept thousands of individuals' unencrypted PII indefinitely.

85.    In sum, the Data Breach could have readily been prevented through the use of industry standard network segmentation and encryption of all PII.

86.    Further, the scope of the Data Breach could have been dramatically reduced had LEI utilized proper record retention and destruction practices.

**F. Plaintiff's Individual Experience.**

*Plaintiff Jessica S. Pukala*

87.    Plaintiff Pukala is a former employee of LEI and was employed by LEI between 2019 and 2023.

88.    LEI obtained Plaintiff's Private Information through the onboarding process of Plaintiff's employment. Specifically, Plaintiff Pukala provided her and her dependents' Private Information when signing up for employee benefits such as insurance. At all relevant times, LEI obtained, stored, and managed Plaintiff Pukala's Private Information.

89.    In August 2025, Plaintiff Pukala received a Notice Letter from LEI informing her that her highly confidential Private Information was accessed and/or acquired in the Data Breach.[50]

90.    Defendant was in possession of Plaintiff's Private Information before, during, and after the Data Breach.

---

[49] *Protecting Personal Information: A Guide for Business*, FTC, *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf, at p. 6.
[50] *See* Ex. 1.

91.    Because of the Data Breach, there is no doubt Plaintiff Pukala's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Pukala and the Class are at an imminent risk of identity theft and fraud.

92.    As a result of the Data Breach, Plaintiff Pukala estimates she has already expended hours of her time mitigating the damages resulting from the Data Breach and will need to do so on a weekly basis. As such, Plaintiff Pukala has suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

93.    As a result of the Data Breach, Plaintiff has received an increase amount of spam emails, spam texts, and spam phone calls, evidencing that cybercriminals are in possession of her sensitive Private Information. Plaintiff has expended hours reviewing financial documents, account statements, filtering spam emails, reviewing credit reports, and other information. This is time that Plaintiff Pukala has lost forever and will never gain back.

94.    Plaintiff Pukala places significant value on the security of her Private Information and does not readily disclose it. Plaintiff Pukala has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

95.    Plaintiff Pukala has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information compromised by the Data Breach. Indeed, Defendant acknowledged the present and

25

increased risk of future harm Plaintiff Pukala, and the Class now face by offering temporary, non-automatic credit monitoring services to Plaintiff Pukala and the Class.

96.     Knowing that thieves intentionally targeted and accessed her Private Information, including her Social Security number, has caused Plaintiff Pukala great anxiety beyond mere worry.

97.     Plaintiff Pukala has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff's and the Class's Private Information will be wholly unprotected and at-risk of future data breaches.

98.     Plaintiff Pukala has suffered injuries directly and proximately caused by the Data Breach, including: (i) theft of her valuable Private Information; (ii) the imminent and certain impending injury flowing from anticipated fraud and identity theft posed by her Private Information being placed in the hands of cybercriminals; (iii) damages to and diminution in value of her Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (iv) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff Pukala should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect her Private Information; (v) loss of time and productivity mitigating the consequences of the Data Breach; and (vi) continued risk to her Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

26

## V.   CLASS ACTION ALLEGATIONS

99. · Plaintiff incorporates by reference all preceding paragraphs as if fully restated here.

100.   Plaintiff brings this action against Defendant on behalf of herself, and all other individuals similarly situated under Wis. Stat. § 803.08. Plaintiff asserts all claims on behalf of a class (the "Class") defined as follows:

> **All persons whose PII was compromised in the Data Breach, including all individuals who were sent a Notice Letter after the Data Breach.**

101.   Excluded from the Class is Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff.

102.   Plaintiff reserves the right to amend the above definition or to propose subclasses in subsequent pleadings and motions for class certification.

103.   Plaintiff anticipates the issuance of notice setting forth the subject and nature of the instant action to the proposed Class. Upon information and belief, Defendant's own business records or electronic media can be utilized for the notice process.

104.   The proposed Class meets the requirements of Wis. Stat. § 803.08.

105.   **Numerosity:** The proposed Class is so numerous that joinder of all members is impracticable. The estimated class size is 10,060 individuals.[51]

106.   **Typicality:** Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class were injured through LEI's uniform misconduct. LEI's inadequate data

---

[51]   https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/229b18d3-d2b9-4c05-99cd-f12a433fc941.html

security gave rise to Plaintiff's claims and are identical to those that give rise to the claims of every other Class member because Plaintiff and each member of the Class had their sensitive PII compromised in the same way by the same conduct of LEI.

107.　**Adequacy:** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class; Plaintiff has retained counsel competent and highly experienced in data breach class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and their counsel.

108.　**Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for members of the Class individually to effectively redress LEI's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

109.　**Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a.  Whether Defendant engaged in the wrongful conduct alleged herein;

b.  Whether Defendant failed to adequately safeguard Plaintiff's and the Class's PII;

c.  Whether Defendant owed a duty to Plaintiff and the Class to adequately protect their PII, and whether it breached this duty;

d.  Whether LEI breached its duties to Plaintiff and the Class;

e.  Whether LEI failed to provide adequate cyber security;

f.  Whether LEI knew or should have known that its computer and network security systems were vulnerable to cyber-attacks;

g.  Whether LEI's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its corporate network;

h.  Whether LEI was negligent in permitting unencrypted PII off vast numbers of individuals to be stored within its network;

i.  Whether LEI was negligent in failing to adhere to reasonable retention policies, thereby greatly increasing the size of the Data Breach;

j.  Whether LEI breached implied contractual duties to Plaintiff and the Class to use reasonable care in protecting their PII;

k.  Whether LEI failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and the Class;

l.  Whether LEI continues to breach duties to Plaintiff and the Class;

m.  Whether Plaintiff and the Class suffered injury as a proximate result of LEI's negligent actions or failures to act;

29

n.  Whether Plaintiff and the Class are entitled to recover damages, equitable relief, and other relief; and

o.  Whether LEI's actions alleged herein constitute gross negligence, and whether Plaintiff and Class Members are entitled to punitive damages.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

110.    Plaintiff incorporates paragraphs 1–98 as though fully set forth herein.

111.    LEI solicited, gathered, and stored the Private Information of Plaintiff and Class Members.

112.    Upon accepting and storing the Private Information of Plaintiff and Class Members on its computer systems and corporate network, Defendant undertook and owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information of Plaintiff and the Class from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

113.    Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully disclosed. Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class Members had no ability to protect their Private Information that was in Defendant's possession. As such, a special relationship existed between Defendant and Plaintiff and the Class.

114.    Because of this special relationship, Defendant required Plaintiff and Class Members to provide their Private Information, including names, Social Security numbers, and other Private Information.

115.   Implied in these exchanges was a promise by Defendant to ensure that the Private Information of Plaintiff and Class Members in its possession was only used for the provided purpose and that Defendant would destroy any Private Information that it was not required to maintain.

116.   As part of this special relationship, Defendant had a duty to perform with skill, care, and reasonable expedience and faithfulness.

117.   Through Defendant's acts and omissions, including Defendant's failure to provide adequate data security, its failure to protect Plaintiff's and Class Members' Private Information from being foreseeably accessed, and its improper retention of Private Information it was not required to maintain, Defendant negligently failed to observe and perform its duty.

118.   Plaintiff and Class Members did not receive the benefit of the bargain with Defendant, because providing their Private Information was in exchange for Defendant's implied agreement to secure and keep it safe and to delete it once no longer required.

119.   Defendant was aware of the fact that cybercriminals routinely target companies and corporations through cyberattacks in an attempt to steal customer and/or employee Private Information. In other words, Defendant knew of a foreseeable risk to its data security systems but failed to implement reasonable security measures.

120.   Defendant owed Plaintiff and the Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing personal information, including taking action to reasonably safeguard or delete such data and providing notification to Plaintiff and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

31

121. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

122. Defendant had duties to protect and safeguard the Private Information of Plaintiff and the Class from being vulnerable to cyberattacks by taking common-sense precautions when dealing with sensitive Private Information. Additional duties that Defendant owed Plaintiff, and the Class include:

    a.    To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, email accounts, protocols, policies, procedures and practices to ensure that Plaintiff's and Class Members' Private Information was adequately secured from impermissible release, disclosure, and publication;

    b.    To protect Plaintiff's and Class Members' Private Information in its possession by using reasonable and adequate security procedures and systems;

    c.    To implement processes to quickly detect a data breach, security incident, or intrusion involving its networks, email accounts, and servers; and

    d.    To promptly notify Plaintiff and Class Members of any data breach, security incident, or intrusion that affected or may have affected their Private Information.

123. Plaintiff and the Class were the intended beneficiaries of Defendant's duties, creating a special relationship between them and Defendant. Defendant was in a position to ensure

that its systems were sufficient to protect the Private Information that Plaintiff and the Class had entrusted to it.

124.    Plaintiff's injuries and damages, as described herein, are a reasonably certain consequence of Defendant's negligence and breach of its duties.

125.    Defendant breached its duties of care by failing to adequately protect Plaintiff's and Class Members' Private Information. Defendant breached its duties by, among other things:

    a.    Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, and protecting the Private Information in its possession;

    b.    Failing to protect the Private Information in its possession using reasonable and adequate security procedures and systems;

    c.    Failing to consistently enforce security policies aimed at protecting Plaintiff and the Class's Private Information;

    d.    Failing to implement processes to quickly detect data breaches, security incidents, or intrusions;

    e.    Failing to promptly notify Plaintiff and Class Members of the Data Breach that affected their Private Information.

126.    Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent considering the foreseeable risks and known threats.

127.    As a direct and proximate result of Defendant's negligent conduct, including but not limited to its failure to implement and maintain reasonable data security practices and procedures as described above, Plaintiff and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

128.    Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Private Information of Plaintiff and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiff and Class Members while it was within Defendant's possession and control.

129.    Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiff and Class Members, Defendant prevented Plaintiff and Class Members from taking meaningful, proactive steps to secure their Private Information and mitigate damages.

130.    Plaintiff and Class Members could have taken actions earlier had they been timely notified of the Data Breach.

131.    Plaintiff and Class Members could have enrolled in credit monitoring, could have instituted credit freezes, and could have changed their passwords, among other things, had they been alerted to the Data Breach more quickly.

132.    Plaintiff and Class Members have suffered harm from the delay in notifying them of the Data Breach.

133.    As a direct and proximate cause of Defendant's conduct, including but not limited to its failure to implement and maintain reasonable security practices and procedures, Plaintiff and Class Members have suffered, as Plaintiff has, and/or will suffer injury and damages, including but not limited to: (i) the loss of the opportunity to determine for themselves how their Private Information is used; (ii) the publication and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information, including the need for substantial credit monitoring and identity protection services for an extended period of time; (iv) lost opportunity

34

costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) costs associated with placing freezes on credit reports and password protections; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information of employees in its continued possession; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives. Thus, Plaintiff and the Class are entitled to damages in an amount to be proven at trial.

134.    The damages Plaintiff and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's negligent conduct.

135.    Plaintiff and the Class have suffered injury and are entitled to actual and punitive damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

136.    Plaintiff incorporates paragraphs 1–98 as though fully set forth herein.

137.    Pursuant to the FTC Act, 15 U.S.C. § 45(a), Defendant had a duty to Plaintiff and the Class to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and the Class.

35

138.    The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

139.    Defendant gathered and stored the Private Information of Plaintiff and the Class as part of their business which affects commerce.

140.    Defendant violated the FTC Act by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

141.    Defendant breached its duties to Plaintiff and the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiff's and Class Members' Private Information, and by failing to provide prompt notice without reasonable delay.

142.    Defendant's multiple failures to comply with applicable laws and regulations constitutes negligence *per se.*

143.    Plaintiff and the Class are within the class of persons that the FTC Act was intended to protect.

144.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against.

145.    Defendant breached its duties to Plaintiff and the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and the Class's Private Information.

36

146.    Defendant breached its duties to Plaintiff and the Class by unreasonably delaying and failing to provide notice of the Data Breach expeditiously and/or as soon as practicable to Plaintiff and the Class.

147.    Defendant's violations of the FTC Act constitute negligence *per se*.

148.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

149.    The injury and harm that Plaintiff and Class Members suffered (as alleged above) was the direct and proximate result of Defendant's negligence *per se*.

150.    Plaintiff and the Class have suffered injury and are entitled to damages in amounts to be proven at trial.

### THIRD CAUSE OF ACTION
### BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

151.    Plaintiff incorporates paragraphs 1–98 as though fully set forth herein.

152.    Plaintiff and the Class entered into implied contracts with Defendant under which Plaintiff and the Class provided their Private Information to Defendant and Defendant agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and the Class that their information had been breached and compromised.

153.    Plaintiff and the Class were required to deliver, and did deliver, their Private Information to Defendant as part of the onboarding employment process and employee benefits enrollment.

154.    Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's hiring business practices. Plaintiff and the Class accepted Defendant's offers and provided their Private Information to Defendant.

155.    Defendant accepted possession of Plaintiff's and the Class's Private Information for the purpose of providing employment and work benefits to Plaintiff and the Class.

156.    When Plaintiff and the Class provided their Private Information to Defendant, either directly or indirectly, in the exchange for employment, they entered into implied contracts with Defendant and intended and understood that their Private Information would be adequately safeguarded.

157.    Plaintiff and the Class entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiff and the Class that their information had been breached and compromised.

158.    In accepting such information, Plaintiff and the Class entered into an implied contract with Defendant whereby Defendant became obligated to reasonably safeguard Plaintiff's and the Class's Private Information.

159.    In delivering their Private Information to Defendant and working for Defendant, Plaintiff and Class Members intended and understood that Defendant would adequately safeguard their Private Information as part of their employment.

160.    The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under the FTC or other state of federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

161.    The implied promises include but are not limited to: (i) taking steps to ensure that the information that is placed in the control of Defendant is restricted and limited to achieve an authorized business purpose; (iii) restricting access to unauthorized individuals; (iii) designing and implementing appropriate retention policies to protect the information against criminal data

38

breaches; (iv) applying or requiring proper encryption; (v) multifactor authentication for access; and (vi) other steps to protect against foreseeable data breaches.

162.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

163.    Had Defendant disclosed to Plaintiff and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and the Class would not have provided their sensitive Private Information to Defendant.

164.    Defendant recognized that Plaintiff's and the Class's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and the Class.

165.    Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

166.    Defendant breached the implied contract with Plaintiff and the Class by, among other acts and omissions: (i) failing to use reasonable data security measures, (ii) failing to implement adequate protocols and employee training sufficient to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure, and (iii) failing to promptly or adequately notify Plaintiff and Class Members of the Data Breach.

167.    As a direct and proximate result of LEI's breaches of these contracts with its employees, Plaintiff and Class Members have suffered and will continue to suffer injuries as set forth herein and are entitled to damages sufficient to compensate for the losses they sustained.

## FOURTH CAUSE OF ACTION
## DECLARATORY AND INJUNCTIVE RELIEF
### (On Behalf of Plaintiff and the Class)

168.    Plaintiff incorporates paragraphs 1–98 as though fully set forth herein.

169.    Plaintiff and the Class seek declaratory judgement and injunctive relief pursuant to Wis. Stat. § 806.04

170.    As previously alleged, Plaintiff and members of the Class entered into implied contracts with Defendant, which contracts required Defendant to provide adequate security for the Private Information collected from Plaintiff and the Class.

171.    Defendant owed and still owes a duty of care to Plaintiff and Class Members that require it to adequately secure Plaintiff's and Class Members' Private Information.

172.    Upon reason and belief, Defendant still possesses the Private Information of Plaintiff and the Class Members.

173.    Defendant has not satisfied its contractual obligations and legal duties to Plaintiff and the Class Members.

174.    Since the Data Breach, Defendant has not yet announced any specific changes to its data security infrastructure, processes or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and go undetected and, thereby, prevent further attacks.

175.    Defendant has not satisfied its contractual obligations and legal duties to Plaintiff and the Class. In fact, now that Defendant's insufficient data security is known to hackers, the Private Information in Defendant's possession is even more vulnerable to cyberattack.

176.    Actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiff and the members of the Class. Further, Plaintiff and the members of the Class are at risk of additional or further harm due to the exposure of their Private Information and Defendant's failure to address the security failings that led to such exposure.

177.    There is no reason to believe that Defendant's security measures are any more adequate now than they were before the Data Breach to meet Defendant's contractual obligations and legal duties.

178.    Plaintiff and the Class, therefore, seek a declaration (1) that Defendant's existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) that to comply with its contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

a.    Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b.    Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

c.    Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

d.    Ordering that Defendant segment employee data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.    Ordering that Defendant purge, delete, and destroy, in a reasonably secure manner, customer data not necessary for their provisions of services;

41

f. Ordering that Defendant conduct regular database scanning and security checks; and

g. Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendant as follows:

a. An order certifying this action as a class action under Wis. Stat. § 803.08, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

b. A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including compensatory damages, punitive damages, attorney fees, expenses, costs, and such other and further relief as is just and proper;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order requiring Defendant to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

e. A judgment in favor of Plaintiff and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

f. An award of such other and further relief as this Court may deem just and proper.

42

## VIII.  **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action

Complaint.


Dated: August 20, 2025                    Respectfully submitted,

                                          By: */s/ Alex Phillips*
                                              Alex Phillips
                                              aphillips@straussborrelli.com
                                              **STRAUSS BORRELLI PLLC**
                                              One Magnificent Mile
                                              980 N Michigan Avenue, Suite 1610
                                              Chicago IL, 60611
                                              Telephone: (872) 263-1100
                                              Facsimile: (872) 263-1109

                                              William B. Federman
                                              (*pro hac vice* forthcoming)
                                              **FEDERMAN & SHERWOOD**
                                              10205 N. Pennsylvania Ave.
                                              Oklahoma City, OK 73120
                                              T: (405) 235-1560
                                              F: (405) 239-2112
                                              E: wbf@federmanlaw.com

                                          *Counsel for Plaintiff and the Putative Class*

# — EXHIBIT 1 —



# LANDS' END

Return Mail Processing
PO Box 589
Claysburg, PA 16625-0589

August 13, 2025

 N7774 L01-0006825 P003 T00018 *********ALL FOR AADC 530
JESSICA S PUKALA
APT 101
4111 STATE ROAD 91
OSHKOSH WI 54904 9221
Ɩʰ·ƖƖ·ƖƖˑƖƖƖƖƖƖƖƖƖƖˑƖˑƖƖƖƖˑˑƖƖƖˑƖˑƖƖƖˑˑƖˑƖˑˑˑƖˑƖˑƖˑƖˑƖˑƖ

Re  Notice of Data Security Incident

Dear Jessica S Pukala

We are writing to let you know that Lands' End  Inc  ("Lands' End ) experienced a data security incident that may have involved some of your personal information  Importantly

- **We have no evidence at this time that your information has been used for any fraudulent purpose as a result of this incident  and**
- **This incident had no impact on our customer-focused systems, including our ecommerce website**

We are sending this letter so you know what happened  what information was potentially involved  what actions we have taken  and what you can do to further address this situation  We regret any concern this may cause  and we ask that you please read this letter carefully

**What Happened?**

On December 6  2024  Lands' End detected that an unauthorized third party had gained access to a small portion of its corporate network  Upon detection of the unauthorized activity  we immediately took steps to contain the issue and investigate what happened with the assistance of law enforcement, industry-leading cybersecurity experts, and outside counsel

Through that investigation  we learned that some data from our corporate network had been copied, some of which could contain personal information  We also conducted a thorough review of the impacted data to determine whether personal information was involved in any way so that we could notify potentially affected individuals

While the incident resulted in temporary changes to the way we used our internal systems, it did not interfere with our commercial operations or the ability to service our customers  In addition, there was no impact on customer-focused systems, including our ecommerce website

**What Information Was Involved?**

Through our investigation, we confirmed on August 3, 2025, that personal information belonging to some current and former employees and some of their dependents was accessed  This information had either been provided to or collected by Lands' End or was voluntarily stored by employees on Lands' End-owned devices  The impacted information may have included your Social Security number

B150072



You can learn more about how to protect yourself from becoming an identity theft victim (including how to place a fraud alert or security freeze) by contacting the FTC:

Federal Trade Commission
Consumer Response Center
600 Pennsylvania Avenue, NW
Washington, DC 20580
1-877-IDTHEFT (438-4338); www.ftc.gov/idtheft

**For District of Columbia Residents:** You can obtain information from the FTC and the Office of the Attorney General for the District of Columbia about steps to take to avoid identity theft. You can contact the D.C. Attorney General at: 441 4th Street, NW, Washington, DC 200001, 202-727-3400, www.oag.dc.gov.

**For Iowa Residents:** State law advises you to report any suspected identity theft to law enforcement or to the Attorney General.

**For Maryland Residents:** You can obtain information from the Maryland Office of the Attorney General about steps you can take to help prevent identity theft. You can contact the Maryland Attorney General at: 200 St. Paul Place, Baltimore, MD 21202, 888-743-0023, https://www.marylandattorneygeneral.gov.

**For Massachusetts Residents:** You have a right to request from us a copy of any police report filed in connection with this incident. If you are the victim of identity theft, you also have the right to file a police report and obtain a copy of it. As noted above, you also have the right to place a security freeze on your credit report at no charge.

**For New York Residents:** You may also contact the following state agencies for information regarding security breach response and identity theft prevention and protection information:

New York Attorney General's Office
Bureau of Internet and Technology
(212) 416-8433
https://ag.ny.gov

NYS Department of State's Division of Consumer Protection
(800) 697-1220
https://www.dos.ny.gov/consumerprotection

**For North Carolina Residents:** You can obtain information from the Federal Trade Commission and the North Carolina Office of the Attorney General about steps you can take to help prevent identity theft. You can contact the North Carolina Attorney General at: 9001 Mail Service Center, Raleigh, NC 27699, 1-877-566-7226, www.ncdoj.gov.

**For Oregon Residents:** State laws advise you to report any suspected identity theft to law enforcement, as well as the Federal Trade Commission. You can contact the Oregon Attorney General at: Oregon Department of Justice, 1162 Court Street NE, Salem, OR 97301-4096, (877) 877-9392, www.doj.state.or.us.

**For Rhode Island Residents:** You can obtain information from the Rhode Island Office of the Attorney General about steps you can take to help prevent identity theft. You can contact the Rhode Island Attorney General at: 150 South Main Street, Providence, RI 02903, (401) 274-4400, www.riag.ri.gov. As noted above, you have the right to place a security freeze on your credit report at no charge but note that consumer reporting agencies may charge fees for other services.

### REFERENCE GUIDE

If you suspect that you are a victim of identity theft or credit fraud, we encourage you to remain vigilant and consider taking the following steps

**Order Your Free Credit Report.** To order your free credit report, visit www.annualcreditreport.com, call toll-free at 877-322-8228, or complete the Annual Credit Report Request Form on the FTC's website at www.ftc.gov and mail it to Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA 30348-5281. Do not contact the three credit bureaus individually, they provide your free report only through the website or toll-free number. When you receive your credit report, review the entire report carefully. Look for any inaccuracies and/or accounts you don't recognize and notify the credit bureaus as soon as possible if there are any.

You have rights under the federal Fair Credit Reporting Act ("FCRA"). These include, among others, the right to know what is in your file, to dispute incomplete or inaccurate information, and to have consumer credit reporting agencies correct or delete inaccurate, incomplete, or unverifiable information. For more information about the FCRA, please visit https://www.consumerfinance.gov or www.ftc.gov

**Place a Fraud Alert on Your Credit File:** A fraud alert helps protect you against the possibility of an identity thief opening new credit accounts in your name. When a merchant checks the credit history of someone applying for credit the merchant gets a notice that the applicant may be a victim of identity theft. The alert notifies the merchant to take steps to verify the identity of the applicant. You can report potential identity theft to all three of the major credit bureaus by calling any one of the toll-free fraud numbers below.

| Equifax | Experian | TransUnion |
|---|---|---|
| www.equifax.com | www.experian.com | www.transunion.com |
| 1-800-525-6285 | 1-888-397-3742 | 1-800-680-7289 |
| P.O. Box 740241 | P.O. Box 9532 | Fraud Victim Assistance Division |
| Atlanta, Georgia 30374-0241 | Allen, Texas 75013 | P.O. Box 2000 |
|  |  | Chester, Pennsylvania 19016 |

**Place a Security Freeze on Your Credit File.** You have the right to place a "security freeze" on your credit file. A security freeze generally will prevent creditors from accessing your credit file at the three nationwide credit bureaus without your consent. You can request a security freeze free of charge by contacting the credit bureaus using the same contact information noted above

The credit bureaus may require that you provide proper identification prior to honoring your request. In order to request a security freeze, you will need to provide: (1) Your full name (including middle initial as well as Jr., Sr., III, etc.), (2) Social Security number, (3) Date of birth, (4) If you have moved in the past five (5) years, provide the addresses where you have lived over the prior five years, (5) Proof of current address, such as a current utility bill or telephone bill, (6) A legible photocopy of a government issued identification card (state driver's license or ID card, military identification etc.), and (7) If you are a victim of identity theft, include a copy of either the police report, investigative report, or complaint to law enforcement agency concerning identity theft

Placing a security freeze on your credit file may delay, interfere with, or prevent timely approval of any requests you make for credit, loans, employment, housing or other services. For more information regarding credit freezes, please contact the credit reporting agencies directly

**Contact the U.S. Federal Trade Commission.** If you detect any incident of identity theft or fraud, promptly report the incident to your local law enforcement authorities, your state Attorney General and the Federal Trade Commission ("FTC"). If you believe your identity has been stolen, the FTC recommends that you take these additional steps

- **Close** the accounts that you have confirmed or believe have been tampered with or opened fraudulently. Use the FTC's ID Theft Affidavit (available at www.ftc.gov/idtheft) when you dispute new unauthorized accounts
- **File** a local police report. Obtain a copy of the police report and submit it to your creditors and any others that may require proof of the identity theft crime



As noted above, there is no evidence that any of this information has been or will be publicly disclosed or that any information accessed as a result of this incident was or will be misused for fraudulent purposes. However, we recognize this may cause concern and have provided below information about steps we are taking, including services we are providing you, and steps you can take to best protect your information.

**What We Are Doing**

Beyond the investigation discussed above, we have also worked with outside cybersecurity experts to reinforce our systems and information security protocols in an effort to help prevent incidents like this from occurring in the future. Please know that we will continue prioritizing strong cybersecurity practices to best protect Lands' End and our stakeholders.

Your safety and security are a high priority, and, to help protect you, we are providing you with access to Experian IdentityWorks℠ credit monitoring and remediation services for 24 months at no charge to you. For two years from the date of enrollment, these services provide you with alerts when changes occur to your credit file. These services also provide you with proactive fraud assistance to help with any questions that you might have or in the event that you become a victim of fraud. We have also provided below additional actions you can take to best protect yourself.

**How do I enroll for the free services?**

We also encourage you to activate the fraud detection and credit monitoring tools available through Experian IdentityWorks. To enroll in these services at no charge, visit www.experianidworks.com/credit and follow the instructions provided. When prompted please provide the following unique code to receive services: SY65DVGZ7. In order for you to receive the monitoring services described above, you must enroll by November 30, 2025. Please note that when signing up for monitoring services, you may be asked to verify personal information for your own protection to confirm your identity. Note that, should you need it, identity restoration assistance is immediately available to you.

Should you have any questions regarding the Credit Monitoring services, have difficulty enrolling, or require additional support, please contact Experian at 1-833-931-7577, and be prepared to provide engagement number B150072 as proof of eligibility.

**What You Can Do**

To help protect your personal information, we strongly recommend you take the following steps, all of which are good ideas in any event:

- **Enroll in the credit monitoring service that we are offering to you.** This will enable you to get alerts about any efforts to use your name and confidential information to establish credit and restoration assistance if you were not the one who initiated it.
- **Carefully review statements** sent to you by your bank, credit card company, or other financial institutions as well as government institutions like the Internal Revenue Service (IRS). Notify the sender of these statements immediately by phone and in writing if you detect any suspicious transactions or other activity you do not recognize.
- **The attached Reference Guide describes additional steps** that you can take and provides resources for additional information. We encourage you to read and follow these steps as well as taking the actions outlined in the two previous bullets.

**More Information**

If you have questions or concerns, please contact us via Questions.DataNotice@landsend.com  Please know we take this matter very seriously, and we apologize for the concern and inconvenience this may cause you.

Sincerely,

*Martin Christopher*

Martin Christopher
Technology & Operations Officer
B150072

K7774-L01